AO 91 (Rev. 11/11)  Criminal Complaint (approved by AUSA K.T. Newton)                   *19-104*

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Pennsylvania

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Dimitre Hadjiev | )   Case No.  19-  1415  -m |
| | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___April 17, 2017 to Feb. 26, 2019___ in the county of _____Philadelphia_____ in the

___Eastern___ District of ___Pennsylvania___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1956 | Money laundering |
| 31 U.S.C. Sections 5324(a), 5313 | Structuring transactions to evade reporting requirements |
| 31 U.S.C. Sections 5324(b), 5331 | Failing to file reports relating to currency received in nonfinancial trade or business |

This criminal complaint is based on these facts:

Between on or about April 17, 2017 and on or about February 26, 2019, in the Eastern District of Pennsylvania, defendant laundered monetary instruments, structured transactions to evade reporting requirements, and failed to file reports relating to currency received in nonfinancial trade or business, in violation of 18 U.S.C. §1956 and 31 U.S.C. §§ 5324(a), 5313, 5324(b), 5331.
See attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Kyle Wood, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___August 20, 2019___

_____
*Judge's signature*

City and state: ___Philadelphia, PA___

Honorable Timothy R. Rice
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**COMPLAINT & ARREST WARRANT,**
**APPLICATION & WARRANT TO SEARCH & SEIZE EVIDENCE,**
**APPLICATION & WARRANT TO SEIZE BANK ACCOUNT**

I, Kyle Wood, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") in Philadelphia, Pennsylvania and have been since September 2017. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. This affidavit is submitted in support of: (a) an arrest warrant for DIMITRE HADJIEV; (b) a search warrant for 330 South Street, Philadelphia, PA, the business address for ICE FIRE INC. ("ICE FIRE"), a/k/a "Dimitre's Jewelry & Watches," a business owned and operated by DIMITRE HADJIEV, further described in Attachment A; and (c) a seizure warrant for all funds in Citizens Bank account number 6233944140.

3. For the reasons stated below, there is probable cause to believe that: (a) DIMITRE HADJIEV has committed criminal activities, including money laundering, in violation of 18 U.S.C. § 1956, structuring cash transactions to avoid reporting requirements, in violation of 31 U.S.C §§ 5324(a) and 5313, and failing to file reports relating to currency received in nonfinancial trade or business, in violation of 31 U.S.C §§ 5324(b) and 5331; (b) there is evidence at this business location relating to criminal activities of DIMITRE HADJIEV,

including interstate transportation of stolen property and receipt and sale of stolen goods that have been transported interstate, in violation of 18 U.S.C. §§ 2314 and 2315, money laundering, in violation of 18 U.S.C. § 1956, structuring cash transactions to avoid reporting requirements, in violation of 31 U.S.C §§ 5324(a) and 5313, and failing to file reports relating to currency received in nonfinancial trade or business, in violation of 31 U.S.C §§ 5324(b) and 5331; and (c) the funds in Citizens Bank account number 6233944140 are property involved in violations of 18 U.S.C. § 1956 and 31 U.S.C § 5324, and property traceable thereto, and are therefore subject to seizure and forfeiture, pursuant to 18 U.S.C §§ 981(a)(1), 981(a)(1)(C), 981(b), 982(a)(1) and 984, 21 U.S.C § 2461, and 31 U.S.C §§ 5317(c)(1) and 5317(c)(2) .

4.   This affidavit is intended to show only that there is sufficient probable cause for the requested complaint and warrants and does not set forth all of my knowledge about this matter.

## AGENT BACKGROUND

5.  Prior to being an FBI Special Agent, I was employed by the FBI for nine years as both an Intelligence Analyst within the Counterterrorism Division at FBI Headquarters and an Investigative Specialist in the FBI Denver office.

6.  I am currently assigned to FBI Philadelphia's Joint Terrorism Task Force ("JTTF"), where I am involved in domestic and international terrorism investigations.

7. I have participated in criminal investigations and have participated in all aspects of investigations, to include conducting physical and electronic surveillance, analyzing financial records and social media information, analyzing information from court-ordered intercepts and pen registers, and analyzing subscriber and telephone toll information obtained as a result of subpoenas. Further, I have conducted and participated in search warrants, arrest warrants, and interviews of witnesses and subjects.

8. As a result of my training and experience, I am familiar with the tactics, methods and techniques of criminals, including the use of computers, cellular telephones, social media, email, and the Internet, in connection with their criminal activity.

## INVESTIGATION BACKGROUND

9. I base this affidavit on my personal investigation and the investigation of other FBI Special Agents and Special Agents with the Internal Revenue Service ("IRS") and an FBI forensic accountant.

10. I am one of the case agents assigned to the criminal investigation of DIMITRE HADJIEV. The information contained within this affidavit is based on my training and experience, as well as my review of documents, source information, recorded conversations, and information and experience imparted to me by other law enforcement officers. Because this affidavit is being submitted for the limited purpose of establishing probable cause and securing an arrest warrant, a search warrant and a seizure warrant, I have not included each and every fact known to me concerning this investigation.

3

11. I have set forth only the facts that I believe are necessary to establish probable cause to believe that: (a) DIMITRE HADJIEV has committed criminal activities, including money laundering, in violation of 18 U.S.C. § 1956, structuring cash transactions to avoid reporting requirements, in violation of 31 U.S.C §§ 5324(a) and 5313, and failing to file reports relating to currency received in nonfinancial trade or business, in violation of 31 U.S.C §§ 5324(b) and 5331; (b) evidence and instrumentalities of violations of 18 U.S.C. § 2314 and 2315 (interstate transportation of stolen property and receipt and sale of stolen items that have been transported interstate); 18 U.S.C. § 1956 (money laundering), 31 U.S.C. §§ 5324(a) (structuring cash transations to avoid reporting requirements), and 5313 and 31 U.S.C. §§ 5324(b) and 5331 (causing or attempt to cause a nonfinancial trade or business to fail to file reports relating to coins and currency received in nonfinancial trade or business) are currently located at 330 South Street, Philadelphia, PA; and (c) the funds in Citizens Bank account number 6233944140 are property involved in violations of 18 U.S.C. § 1956 and 31 U.S.C § 5324, and property traceable thereto.

12. I have discussed this investigation with other law enforcement agents and we have discussed techniques and methods by which white collar criminals maintain records to identify and locate other ill-gotten property and proceeds and moneys owed and received, as well as the techniques and methods by which white collar criminals acquire, spend, convert, transport, distribute and conceal the proceeds they derive from their unlawful activities.

4

13. Based upon my training, experience, discussions with other law enforcement agents, and
participation in this and other investigations, I have reason to believe that individuals, such as
DIMITRE HADJIEV, who are involved in the receipt and sale of stolen property and money
laundering:

 (a) often place assets in names other than their own to avoid detection of these assets by
  government and law enforcement agencies, but actually own and continue to use
  these assets and exercise dominion and control over them;

 (b) maintain in their business locations computerized or written books, records, receipts,
  diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers
  relating to the frauds being perpetrated;

 (c) conceal contraband, proceeds of fraud, records of these transactions, and records
  reflecting names, nicknames, addresses and telephone numbers of associates within
  their business locations for ready access and to hide them from law enforcement
  agencies;

 (d) maintain records reflecting names, nicknames, addresses and telephone numbers of
  both their current and past associates;

 (e) conceal within their businesses large amounts of currency, financial instruments,
  precious metals, precious gemstones, jewelry, electronic equipment, and other items
  of value and/or proceeds of money laundering and evidence of financial transactions

5

relating to obtaining, transferring, secreting, or spending large sums of money made
in illegal activities; and

(f) attempt to legitimize the profits from illegal transactions by using domestic banks and
their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money
drafts, letters of credit, brokerage houses, and real estate).

14. I am aware that federal courts have recognized that an unexplained increase in wealth is
probative evidence of crimes motivated by greed and, based on my training and experience, I
know that individuals engaged in the receipt and sale of stolen property and money
laundering will accumulate and maintain substantial amounts of proceeds from an unlawful
activity, specifically currency, over a period of years, so that the proceeds can be used in later
years for personal asset acquisitions and/or expenditures during periods when the money
launderer is not committing fraud.

### Background of Investigation

15. Since 2014, the FBI Violent Crimes Task Force and the Philadelphia Police Department,
Major Crimes Division, have investigated a series of jewelry store distraction thefts and
robberies reported to have been committed in multiple states by groups of males from the
Philadelphia, Pennsylvania area between 2012 and late 2016. During the distraction thefts, a
male entered the jewelry stores for the purpose of distracting employees and other males then
entered the stores separately to covertly remove jewelry and/or watches from the jewelry
store display cases. Law enforcement officers investigating these thefts determined, through

6

review of video surveillance recordings from the stores, that an individual, who later became a confidential source ("CS1"),[1] was one of the participants in these distraction thefts.

16. In an interview in December 2016, CS1 admitted to participating with others in at least 36 diversionary style jewelry store thefts in multiple states between January 2014 and October 2016. CS1 stated that the stolen goods were almost always brought back to Philadelphia, where they were sold to "dirty jewelers" on South Street or Jeweler's Row. CS1 identified one of the "dirty jewelers" who bought those stolen goods as DIMITRE HADJIEV, the owner of ICE FIRE, a jewelry store located at 330 South Street, Philadelphia, PA. According to CS1, stolen watches from the jewelry store thefts were always taken to HADJIEV. CS1 stated that he never sold legitimately obtained watches to HADJIEV.

---

[1]   On November 26, 2002, CS1 was convicted of interstate transportation of stolen goods in the Eastern District of Pennsylvania and was sentenced to 24 months' imprisonment and three years' supervised release. In addition, on October 10, 2018, CS1 entered a guilty plea to interstate transportation of stolen goods and fraudulent use of a social security number in the Eastern District of Pennsylvania and hopes to get a benefit from the government through a cooperation guily plea. Philadelphia County records show that CS1 had been arrested on at least 15 prior occasions for theft-related and burglary charges and been convicted of theft crimes on at least ten occasions, with the latest occurring in 2015.

7

17. In the robberies, a different group of males, including an individual who later became a confidential source ("CS2"), [2] committed robberies of jewelry stores. CS2 provided the following information about the sale of stolen high-end watches to HADJIEV in interviews in the fall of 2012 and September 2015. CS2 was part of a "crew" that committed robberies of jewelry stores in the Philadelphia, PA area, stealing mostly high-end watches, in 2012. CS2's compensation for participating in the robberies was the receipt of some of the stolen watches. CS2 received approximately 24 stolen watches from a January 2012 robbery of Govberg & Son Jewelers and sold them to "DIMITRE" at ICE FIRE. CS2 received two stolen Rolex watches from a February 2012 robbery of Bernie Robbins Jewelry and also sold them to DIMITRE at ICE FIRE. CS2 sold two or three stolen Rolex watches from an April 2012 robbery of Tourneau Jewelers to DIMITRE at ICE FIRE for approximately $30,000. CS2 also stated that he accompanied another member of the "crew" when that individual sold two stolen women's Rolex watches from an August 2012 robbery of Tourneau Jewlers to DIMITRE at ICE FIRE for approximately $18,000. According to CS2, if DIMITRE

_____

[2] CS2 entered a guilty plea, pursuant to a cooperation agreement, in the Eastern District of Pennsylvania, to multiple counts of conspiracy, robbery and use of a firearm during a crime of violence and, on June 15, 2016, was sentenced to 24 months imprisonment. CS2 also entered a guilty plea, pursuant to a cooperation agreement, in the Eastern District of Pennsylvania, to conspiracy to commit Hobbs Act robbery, the commission of Hobbs Act robbery and possession of a firearm in relation to a crime of violence and, on June 16, 2015 was sentenced to 102 months imprisonment.

8

HADJIEV thought a watch was "too hot," he would pay a lower price for that stolen watch.

## Current Investigation

18. On April 17, 2017, at the direction of FBI agents, CS1, after going to ICE FIRE but not making contact with DIMITRE HADJIEV, contacted HADJIEV on HADJIEV's cellphone and then met with HADJIEV in person at ICE FIRE and sold HADJIEV the following two allegedly stolen Rolex watches, both of which were certified used Rolex watches that had been purchased from Signet Jewelers by the FBI: (a) a Rolex Oyster Submariner, 14k yellow gold, men's wristwatch, Model #16613, Serial #U730355, with a retail value of $12,800; and (b) a Rolex GMT Master II Oyster, 18k yellow gold, men's wristwatch, Model #16713, Serial #S353721, with a retail value of $12,400. During this meeting in a room in the back of the store, which was recorded, CS1 represented to HADJIEV that both of the Rolex watches were stolen, stating to HADJIEV: "Yea. Can't be choicy when they fall off the truck." HADJIEV purchased both allegedly stolen Rolex watches from CS1 for a total of $5,000. HADJIEV paid CS1 $5,000 in cash which he obtained from an unknown location within the store. HADJIEV did not ask CS1 for identification or provide CS1 with a receipt of this sale.

19. On October 20, 2017, at the direction of FBI agents, CS1 again met with HADJIEV at ICE FIRE and sold HADJIEV the following two allegedly stolen Rolex watches, both of which were certified used Rolex watches purchased from Signet Jewelers by the FBI: (a) a Rolex Oyster Submariner, stainless steel, perpetual date, men's wristwatch, Model #16610, Serial #N398215, with a retail value of $8,200; and (b) a Rolex Oyster Presidential, 18k yellow

9

gold, perpetual date, men's wristwatch, Model #18038, Serial #9587413, with a retail value
of $29,800. During this meeting, which was recorded, CS1 told HADJIEV: "I got two."
Referring to one of those allegedly stolen watches, HADJIEV said that it was "old," to which
CS1 replied: "It's used. Do you know what I mean?" HADJIEV agreed to purchase both
watches for a total of $8,000, paid CS1 $2,000 in cash, and asked CS1 to return in two hours
for payment of the remaining $6,000. CS1 agreed and left the store. CS1 returned to ICE
FIRE two hours later and, at that time, HADJIEV paid CS1 the remaining $6,000 balance for
the two allegedly stolen Rolex watches. HADJIEV did not ask CS1 for identification or
provide CS1 with a receipt. This second meeting was also recorded.

20. On October 20, 2017, FBI agents observed the following activities of HADJIEV after he paid
$2,000 to CS1 and before he paid the remaining $6,000 to CS1: (a) he left ICE FIRE; (b) he
talked on a cell phone; (c) he met an unknown male; (d) he and the unknown male walked
together east on South Street in Philadelphia; (e) a short time later, he entered a green Ford
SUV driven by an unknown driver that was parked on South Street and the car left the area;
(e) approximately one hour later, he returned to ICE FIRE.

21. On April 25, 2018, at the direction of FBI agents, an FBI undercover employee ("UC1")
went to ICE FIRE and sold to HADJIEV, for $7,500, an allegedly stolen Rolex gold Oyster
Perpetual Day-Date 36 Chronometer watch, Model #M118238-0108, Serial #85P33819, with
a retail value of $31,350, that had been purchased from Rolex by the FBI. UC1 represented
to HADJIEV that the Rolex watch was stolen, stating that the Rolex watch had "no

10

paperwork," was "clean," and had been bought "off the street." HADJIEV paid $2,900 to UC1 as a down payment and asked UC1 to return the following day for the $4,600 balance owed. During that meeting, HADJIEV told UC1 to download and use the WhatsApp social application to communicate with HADJIEV. HADJIEV did not ask UC1 for identification or provide UC1 with a receipt. Also, at that meeting, UC1 told HADJIEV: "I got two more like this," and showed HADJIEV two additional allegedly stolen Rolex watches. This meeting was recorded.

22. On April 26, 2018, UC1 returned to ICE FIRE to collect the remaining cash payment of $4,600 from the April 25, 2018 watch sale. HADJIEV, however, only paid $4,500 to UC1 at that time. At this meeting, UC1 again showed HADJIEV the two additional allegedly stolen Rolex watches and HADJIEV agreed to purchase those for $16,000. Those two additional allegedly stolen Rolex watches, purchased by the FBI from Rolex, were: (a) a Black Square Rolex Oyster Perpetual Day-Date 36 Chronometer watch, Model #M118238-0089, Serial #J5280381, with a retail value of $37,050; and (b) a gold Cham Rom Rolex Oyster Perpetual Day-Date 40 Chronometer Chronergy watch, Model #M228238-0006, Serial #3192K5T0, with a retail value of $34,850. HADJIEV asked UC1 to wait at ICE FIRE while HADJIEV left the store to obtain cash for the two Rolex watches. This meeting was recorded.

23. FBI Special Agents conducting physical surveillance during this undercover operation, observed HADJIEV depart ICE FIRE at approximately 2:42 p.m. and enter a vehicle with an UBER sticker displayed in the window.

11

24. At approximately 3:25 p.m., HADJIEV returned to ICE FIRE and paid $16,100 to UC1 for the two allegedly stolen Rolex watches. HADJIEV did not ask UC1 for identification or provide UC1 with a receipt. After the transaction was completed, UC1 asked HADJIEV if he was looking for any other watches and HADJIEV responded that he needed a gold or two tone silver and gold "Sky Dweller" for a client. HADJIEV showed UC1 a picture of a gold "Sky Dweller" on his cell phone. Due to an error, this meeting was not recorded.

25. On May 2, 2018, I viewed HADJIEV's publically accessible Instagram account, dimitrethejeweler – Dimitre's ICE FIRE Inc, and saw a photograph with a gold Rolex watch, with the following caption: "Clean !! . . . #southstreetphilly #beverlyhills #belair #rodeodrive #jewelersrowphiladelphia #dimitresicefireinc #daydate4mm #2018#." I, and fellow agents, believed that this watch, was the gold Cham Rom Rolex Oyster Perpetual Day-Date 40 Chronometer Chronergy watch, Model #M228238-0006, Serial #3192K5T0, sold to HADJIEV by UC1 on April 26, 2018.

26. On May 7, 2018, at the direction of FBI agents, a confidential source ("CS3"), with an FBI Task Force Officer ("TFO") acting in an undercover capacity ("UC2"), met with HADJIEV inside ICE FIRE. CS3 spoke with HADJIEV and inquired about the Rolex watch posted on HADJIEV's Instagram account. HADJIEV showed the Rolex watch for sale to CS3 and UC2, stating that it was for sale for $29,000. CS3 set up a follow-up meeting with HADJIEV for May 8, 2018 to purchase the Rolex watch.

27. On May 8, 2018, at the direction of FBI agents, CS3 and UC2 met with HADJIEV inside
ICE FIRE and purchased the Rolex watch that had been posted on HADJIEV's Instagram
account for $29,000. During the transaction, HADJIEV continually tried to convince CS3 to
pay in increments of less than $10,000 to avoid IRS reporting requirements, and offered to
falsify a receipt for items and services not purchased as a way to minimize the sales tax and
reporting requirements. Before the transaction was completed, HADJIEV offered to clean the
watch for CS3. During the transaction, UC2 observed HADJIEV walking in and out of the
back room and, at one point, UC2 observed HADJIEV remove the back of the Rolex watch
case from the body of the watch with a tool. At the end of the Rolex watch purchase, CS3
asked HADJIEV about a receipt for the purchase and HADJIEV told CS3 and UC2 that he
would not provide a receipt for the Rolex watch. This meeting was recorded.

28. During this transaction, HADJIEV provided instructions to CS3 about structuring cash
payments and avoid IRS reporting requirements. The following are comments HADJIEV
made in the presence of CS3 and UC2 during the purchase of the Rolex watch for $29,000:
*(DH- Dimitre Hadjiev / UI-Unintelligible / OV-Overlapping Voices)*

> *DH: That's how you usually do it. You gotta take, give the payment like ten thousand at a
> time*
>
> *DH: (UI) (OV) I'm gonna take the money from you right now, but it's not that simple.*
>
> *DH: (UI) ten thousand we gotta report it to IRS. That's why if we break the-the price of
> the watch or just somehow I write up a receipt for diamonds or we write a receipt that*

13

*you purchased diamonds and you purchased the watch, purchased labor than that would make more sense, but not (UI) (OV).*

*DH: But, this is a high volume watches and then mine doesn't come with the warranty and if you go to Rolex, they are going to ask you, where did you buy this watch from? And if they ask you, ohh, you didn't buy it from us, I'm sorry, you can't get no warranty. Do you understand? So that's why it's ten thousand dollar cheaper because we buy from a jewelry store, bunch of jewelry stores from South Street, but because you wanna spe-spend all this cash in one day, I don't wanna write the receipt and get deported by IRS.*

29. On May 11, 2018, FBI Special Agent James Finnegan and FBI TFO John Benham took the Rolex watch purchased from HADJIEV by CS3 and UC2 to Govberg Jewelers, 1521 Walnut Street, Philadelphia, Pennsylvania, through coordination with the Rolex USA Director of Security, for an examination. The examination revealed that the watch was a Gold Rolex Oyster Perpetual Day-Date 40 Chronometer, Model #M22823, but the serial number had been almost completely erased by either buffing or polishing. According to the examiner, whoever polished or buffed the serial number knew exactly what they were doing to not damage the watch or the watch movements. The method used by the examiner to locate the serial number -- removing the back of the watch case from the body -- was the same as the actions that UC2 saw HADJIEV take during the May 8, 2018 transaction.

30. On July 19, 2018, FBI Special Agent James Finnegan and FBI TFO John Benham took the Rolex watch purchased from HADJIEV by CS3 and UC2 on May 8, 2018 to Rolex USA,

14

665 Fifth Avenue, New York, New York 10022 to be examined by Rolex. The examination

by Rolex confirmed that the internal movement number matched the serial number for Model

Number M228238-0006, Serial Number 3192K5T0, Gold Perpetual Day-Date 40

Chronometer, sold by Rolex to the FBI, and that this watch was one of the watches sold as an

allegedly stolen Rolex watch to HADJIEV by UC1.

31. On September 21, 2018, UC1 contacted HADJIEV via WhatsApp and provided a photo of a

Rolex "Sky-Dweller" watch next to two other Rolex watches and asked HADJIEV if he was

still interested in purchasing the Sky-Dweller watch, referring to HADJIEV's request during

the April 26, 2018 meeting with UC1. HADJIEV responded with a request for UC1 to bring

all three watches to HADJIEV. UC1 responded that he would bring the watches after the

"dust settles" from the "rip" (indicating stolen watches).

32. On October 20, 2018, HADJIEV attempted to contact UC1 late at night via a Whats App

video chat.

33. On December 19, 2018, FBI Special Agents purchased two certified Rolex watches from

Bernie Robbins Jewelers in Marlton, NJ: (a) a Rolex 40MM 18K yellow gold Day-Date

Fluted Bezel - Silver Roman Dial President Brac, Model #M228238-0002, Serial

#C292M306, with a retail value at $34,850 and (b) a Rolex Mens 18K white gold Sky-

Dweller - GMT - Annual Calendar - Black Dial -Black Strap, Model #M326139-0002, Serial

#031280H8, with a retail value of $39,550. These two watches were purchased in

15

anticipation of UC1 setting up an in-person meeting with HADJIEV to sell the watches, represented as stolen from an out of state robbery, to HADJIEV.

34. On January 23, 2019, at the direction of FBI agents, UC1 went to ICE FIRE and sold to HADJIEV, for a total of $17,000, one certified Rolex watch that had been purchased from Rolex by the FBI on March 28, 2018, a Rolex silver dial index, Oyster Perpetual Day-Date 40 Chronometer Chronergy, Model #M228238-0008, Serial #0L289269, with a retail value of $34,85), and the two certified Rolex watches purchased from Bernie Robbins Jewelers by the FBI on December 19, 2018.  UC1 represented to HADJIEV the three Rolex watches were stolen. Along with the watches, UC1 provided HADJIEV with Rolex boxes for the Rolex 40MM 18K yellow gold Day-Date Fluted Bezel - Silver Roman Dial President Brac, Model #M228238-0002, Serial #C292M306,  and the Rolex Mens 18K white gold Sky-Dweller - GMT - Annual Calendar - Black Dial - Black Strap, Model #M326139-0002, Serial #031280H8, and told HADJIEV he did not have a Rolex box for the Rolex silver dial index, Oyster Perpetual Day-Date 40 Chronometer Chronergy, Model #M228238-0008, Serial #0L289269, because that job was done "quick and dirty."  UC1 also told HADJIEV that the two watches with boxes, "caused me a lot of problems...me and my boys...we put it on lock down...we had to wait...until that dust settled after we hit them places and got these watches; it was hot."  HADJIEV indicated he understood the watches were stolen, stating to UC1: "I cannot display this stuff," and explaining that he would have to ship "them overseas."  During the transaction, HADJIEV said he only had $15,000 on hand inside the

16

store and needed to go get the remaining $2,000. HADJIEV asked UC1 to return to the store in approximately 30 minutes, stating that he would text UC1 when he returned with the remaining cash.

35. FBI Special Agents conducted physical surveillance during the undercover operation on January 23, 2019. Agents observed UC1 depart ICE FIRE on foot and observed HADJIEV depart ICE FIRE a short time later and enter a maroon Ford Fusion, New Jersey tag 872JPP, displaying an UBER sticker. The operator of the Ford Fusion drove HADJIEV to the general vicinity of 8th and Walnut Streets in Philadelphia, where HADJIEV exited the vehicle and entered a Citizens Bank branch. While in the Citizens Bank branch, HADJIEV was observed using a cell phone. After leaving the bank, HADJIEV entered a Honda CRV, Pennsylvania tag JNR 7446, displaying an UBER sticker. The operator of the Honda CRV drove HADJIEV back to ICE FIRE and HADJIEV entered the store. UC1 entered ICE FIRE a short time after HADJIEV returned.

36. Once UC1 had returned to the store, HADJIEV paid UC1 $17,000 for the three allegedly stolen watches. This meeting was recorded.

**LAYOUT AND CURRENT OPERATION OF BUSINESS AT 330 SOUTH STREET**

37. I have reviewed the video of recorded meetings between HADJIEV and CS1, UC1, UC2 and CS3 and have learned from these individuals their impressions of the physical layout of the ICE FIRE business. The main entrance to the store is located approximately midblock on the south side of South Street. The main door visible to South Street leads into a small area, a

17

"mantrap", where there is another door before entering the actual store. In this area, an armed

security guard greets patrons before the door to the store is unlocked for patrons to browse.

Once inside, there is a single, long, aisle with wall display counters on three of four sides,

which include bullet-proof glass from the ceiling to the top of the display cases. Behind the

glass and on the walls are more display cases. In the back right corner there is a single door

to enter behind the glass as well as an area containing a one-way box for handing items to a

person behind the glass. Behind the glass and in the back right corner of the area viewable by

patrons, there is a doorway to an area containing the upstairs entrance and offices, with an

area where HADJIEV has taken the items to be cleaned and to count money.

38. On August 9, 2019, I, with another FBI Special Agent, went to ICE FIRE. From the outside

of the building, we observed that the store was open, a security guard was stationed outside

the business, and there were Rolex watches and diamond jewelry displayed in the window.

## BUSINESS ENTITIES OWNED BY DIMITRE HADJIEV

39. An FBI Forensic Accountant, Eric Hiser, reviewed the corporate structure of the following

businesses for which DIMITRE HADJIEV is the registered owner:

   a. Ice Fire Inc., Tax ID #27-1573071, 330 South Street, Philadelphia, PA 19147-1536,

   established on December 23, 2009;

   b. Dimitre's Ice Fire Inc., Tax ID #82-1508070, 330 South Street, Philadelphia, PA 19147-

   1536, established on May 17, 2017; and

18

c. 201 Long Lane LLC, Tax ID #82-1755907, 201 Long Lane, Upper Darby, PA 19082, established on June 30, 2017.

## ICE FIRE INSTAGRAM ACCOUNT

40. I have looked at the Instagram account of ICE FIRE and saw that 27 posts had been made between January 19 and July 29, 2019. Nineteen of those posts had photographs of high-end watches, including seven photographs of watches that could clearly be identified as Rolex watches. The Rolex watches all appeared to be customized, with additional diamonds or different faces on the watches. In addition, on July 20, 2019, photographs of HADJIEV with a new Tesla car were posted.

## RESIDENCE ON THIRD FLOOR OF 330 SOUTH STREET

41. During the course of this investigation, I came to learn of an area on the third floor of 330 South Street, Philadelphia, Pennsylvania, containing a sleeping area, small kitchen area and a television, that is used by HADJIEV as a residential area. The television is used by HADJIEV to monitor security cameras within ICE FIRE as well as a separate property owned by HADJIEV located at 201 Long Lane, Upper Darby, Pennsylvania.

42. On April 10, 2019, HADJIEV was interviewed by Customs and Immigration Service ("CIS") personnel regarding his pending application for citizenship. During this interview, when asked where he stays when he is in Philadelphia, HADJIEV stated "at the store location" at 330 South Street and responded positively when asked if there was accommodations for someone to sleep, and stated there is a "space with a bathroom." HADJIEV also explained to

19

CIS personnel that, when his spouse visited Philadelphia, both he and his spouse stayed at 330 South Street.

43. In 2018, officers with the Philadelphia Police Department ("PPD") interviewed HADJIEV at 330 South Street with respect to an incident reported by HADJIEV. During that interview, PPD officers entered the residential area on the third floor of 330 South Street and observed a bed and television on that floor. While in the residential area, PPD personnel observed the surveillance cameras of two locations on the television. During the course of the interview, HADJIEV was asked to retrieve surveillance footage for the 330 South Street location, and HADJIEV used two laptops to download that surveillance video.

## FINANCIAL ANALYSIS

44. FBI Forensic Accountant Eric Hiser examined HADJIEV's bank account activities from January 2017 through February 2019, and determined that, for business related transactions, HADJIEV utilized the following bank accounts:

   a. Wells Fargo Bank, account number 5249132480 ("Wells Fargo #2480"), business services account in the name of Ice Fire Inc., signers Dimitar Hadzhiev, Dimitre Hadjiev, open for the period of November 11, 2017 to October 25, 2018;

   b. Wells Fargo Bank, account number 8673356864 ("Wells Fargo #6864"), savings account in the name of Ice Fire Inc., signers Dimitar Hadzhiev, Dimitre Hadjiev, open for the period of December 7, 2015 to October 25, 2018;

20

     c.  Wells Fargo Bank, account number 7362455110 ("Wells Fargo #5110"), business

         services account in the name of Dimitre's Ice Fire Inc., signer Dimitre Hadjiev, open

         for the period of June 27, 2017 to October 29, 2018; and

     d.  Citizens Bank, account number 6233944140 ("Citizens Bank #4140"), checking

         account in the name of Dimitre's Ice Fire Inc., signer Dimitre Hadjiev, open for the

         period of October 1, 2018 to the present.

45. A review of deposits on and after the dates of the undercover Rolex watch purchases from

    CS1 and UC1 and the sale of the Rolex watch to CS3 and UC2, as well as on other dates,

    revealed activity consistent with structuring of cash deposits to avoid filing currency

    transaction reports ("CTRs") for deposits of more than $10,000. The financial analysis

    detailed in the following paragraphs highlights HADJIEV's financial activities that occurred

    before and after the undercover purchases and sale and demonstrates significant structured

    cash deposit activity following undercover activity conducted with HADJIEV at ICE FIRE.

    As of August 13, 2019, queries by an IRS TFO with the FBI revealed that HADJIEV has not

    filed IRS Form 8300 for any cash payment over $10,000, including for the May 8, 2018 cash

    purchase of a Rolex watch by CS3 for $29,000, as required under 31 U.S.C. § 5331.

46. During his examination, FBI Forensic Accountant Hiser identified patterns and trends of

    HADJIEV's financial activities before and after undercover sales. Specifically, HADJIEV

    took out business loans from QuarterSpot Loans, Kabbage Inc., Ocwen, and M&T Bank, and

    made credit card purchases through his accounts with American Express and Barclay for

business expenses. HADJIEV then paid large payments to those loan providers and credit

card companies after he made multiple cash deposits just under the currency transaction

report ("CTR") reporting limits, that is, $10,000, as required under 31 U.S.C. § 5313.

Further, after making those cash deposits HADJIEV paid rent for his store location and

conducted transactions with other companies in the jewelry industry.

47. Based on this forensic accounting examination, and as demonstrated below, there is probable

cause to believe that HADJIEV purchased the allegedly stolen watches from CS1 and UC1,

sold those watches at prices far exceeding the prices for which he purchased the watches, and

then used the proceeds from those sales to fund his business operations.  An example of this

pattern is seen during and after HADJIEV's purchase of an allegedly stolen Rolex watch

from UC1 and the subsequent sale of that Rolex watch to C2S and UC2.

### April 17, 2017 Sale of Watches to HADJIEV

48. On April 17, 2017, CS1 sold two allegedly stolen Rolex watches, with a total retail value of

$25,200, to HADJIEV at ICE FIRE for $5,000.  HADJIEV did not withdraw any cash from

any known bank account in close proximity to the purchase of the watches, but retrieved the

cash used to purchase the watches from an unknown location within ICE FIRE.

49. Following the purchase of the Rolex watches by HADJIEV, cash, totaling $61,186, was

deposited into ICE FIRE's Wells Fargo #2480, between April 17 and May 8, 2017.  Below is

a listing of cash deposit activity in this period when the total cash deposited on a single day

approached or exceeded the $10,000 CTR reporting limit. Given the timing and amounts,

22

these deposits appear to be structured in a manner to avoid the filing of CTRs. Wells Fargo

filed a CTR for the April 17, 2017 deposits, as the aggregate deposits exceeded $10,000 on

that date.

| Account | Date | Bank Statement Description | Deposit Components | Amount | Total Deposited | CTR Filed (Yes/No) |
|---|---|---|---|---|---|---|
| WF #2480 (ICE FIRE Inc) | 4/17/2017 | eDeposit IN Branch/Store 04/17/17 12:49:44 Pm 340 S 2ND St Philadelphia PA 0233 | Cash | $9,950 | $10,400 on 4/17/2017 | Yes, by Wells Fargo |
| WF #2480 (ICE FIRE Inc) | 4/17/2017 | Deposit Made In A Branch/Store | Cash | 450 | | |
| WF #2480 (ICE FIRE Inc) | 4/24/2017 | eDeposit IN Branch/Stare 04/24/17 02:54:01 Pm 340 S 2ND St Philadelphia PA 0233 chant 11117651FA | Cash | 9,900 | 9,900 | No |
| WF #2480 (ICE FIRE Inc) | 4/25/2017 | eDeposit IN Branch/Store 04/25/17 01:31:36 Pm 340 S 2ND St Philadelphia PA 0233 | Cash | 5,000 | 5,000 | No |
| WF #2480 (ICE FIRE Inc) | 4/26/2017 | eDeposit IN Branch/Store 04/26/17 12:29:42 Pm 340 5 2ND St Philadelphia PA 0233 | Cash | 6,140 | 6,140 | No |
| WF #2480 (ICE FIRE Inc) | 5/3/2017 | eDeposit iN Branch/Store 05/03/17 10:23:37 Am 340 S 2ND St Philadelphia PA 0233 | Cash | 9,950 | 9,950 | No |

50. After making the cash deposits on April 17, 2017, HADJIEV made a business loan payment

from Wells Fargo #2480 to Kabbage Inc. in the amount of $9,000. One week later, on April

24, 2017, after making cash deposits, HADJIEV wired $24,500 from Wells Fargo #2480 to a

jewelry company, Black Sea Jeweler's, operated by HADJIEV's sister, Kristina Groetsch.

October 20, 2017

51. On October 20, 2017, CS1 sold two allegedly stolen Rolex watches, with a total retail value of $38,000, to HADJIEV for $8,000. HADJIEV paid CS1 $2,000 in cash during the initial meeting with HADJIEV, followed by a payment of $6,000 in cash two hours later. No cash was withdrawn from any of HADJIEV's known accounts within close proximity to the watch purchases.

52. Between October 20, 2017 and November 10, 2017, cash totaling $75,990 was deposited into Wells Fargo #2480.

53. Below is a listing of cash deposit activity in this period when the total cash deposited on a single day approached the $10,000 CTR reporting limit. Of the $75,990 deposited during this period, no cash deposits exceeded $10,000 on any single day or generated the filing of a CTR. However, given the timing and amounts, these deposits appear to be structured in a manner to avoid the filing of CTRs.

| Account | Date | Bank Statement Description | Deposit Components | Amount | CTR Filed (Yes/No) |
|---|---|---|---|---|---|
| WF #2480 (ICE FIRE Inc) | 10/23/2017 | eDeposit IN Branch/Store 10/23/17 12:56:29 Pm 340S 2ND St Philadelphia PA 0233 | Cash | $9,500 | No |
| WF #2480 (ICE FIRE Inc) | 10/25/2017 | eDeposit IN Branch/Store 10/25/17 04:24:02 Pm 340S 2ND St Philadelphia PA 0233 | Cash | 9,000 | No |
| WF #2480 (ICE FIRE Inc) | 10/27/2017 | eDeposit IN Branch/Store 10/27/17 03:03:10 Pm 340 S 2ND St Philadelphia PA 0233 | Cash | 9,470 | No |

| Account | Date | Bank Statement Description | Deposit Components | Amount | CTR Filed (Yes/No) |
|---|---|---|---|---|---|
| WF #2480 (ICE FIRE Inc) | 10/30/2017 | eDeposit IN Branch/Store 10/30/17 12:00:25 Pm 340 S 2ND St Philadelphia PA 0233 | Cash | 9,900 | No |
| WF #2480 (ICE FIRE Inc) | 11/3/2017 | eDeposit IN Branch/Store 11/03/17 4:16:36 Pm 340 S 2ND St Philadelphia PA 0233 | Cash | 8,070 | No |
| WF #2480 (ICE FIRE Inc) | 11/9/2017 | eDeposit IN Branch/Store 11/09/17 10:48:35 Am 7950W Sunset Blvd Los Angeles CA | Cash | 9,500 | No |
| WF #2480 (ICE FIRE Inc) | 11/10/2017 | eDeposit IN Branch/Store 11/10117 11:01:04 Am 7950W Sunset Blvd Los Angeles CA | Cash | 9,500 | No |

54. During this period, HADJIEV's cash deposits, totaling $75,990, funded: (a) credit card payments of $21,795 to American Express and $8,868 to Barclay; (b) business loan payments of $10,526 to QuarterSpot Inc.; and (c) rent payments of $5,202 for 330 South Street. During this period, HADJIEV also made bank and credit card payments, totaling $16,806, to jewelry industry related businesses, specifically Jewelry Diamonds, H. Chandra Diamonds, and Kozin Jewelers.

April 25 & 26, 2018 and May 8, 2018

55. On April 25 and 26, 2018, UC1 sold three allegedly stolen Rolex watches, with a total retail value of $103,250, to HADJIEV for $23,500. In addition, on May 8, 2018, one of those allegedly stolen Rolex watches was purchased from HADJIEV for $29,000 by CS3 and UC2. No cash was withdrawn from any bank account by HADJIEV in close proximity to the watch

25

purchases by HADJIEV from UC1. The cash used by HADJIEV to purchase those watches originated from an unknown source.

56. Between April 25 and May 22, 2018, cash, totaling $60,420, was deposited into Wells Fargo #2480.

57. Below is a listing of cash deposit activity during this period where the total cash deposited on a single day approached the CTR reporting limit. The timing and amount of the these deposits appear to be structured in a manner to avoid the filing of a CTR. The deposits made between May 8 and 10, 2018, totaling $27,050, coincide with the purchase of the Rolex watch for $29,000 by CS3 and UC2 on May 8, 2018.

| Account | Date | Bank Statement Description | Deposit Components | Amount | CTR Filed (Yes/No) |
|---|---|---|---|---|---|
| WF #2480 (ICE FIRE Inc) | 5/4/2018 | Edeposit IN Branch/Store 05/04/18 01:04:03 Pm 340 S 2ND St Philadelphia PA 0233 | Cash | 9,960 | No |
| WF #2480 (ICE FIRE Inc) | 5/8/2018 | Edeposit IN Branch/Store 05/08/18 01:32:18 Pm 340 5 2ND St Philadelphia PA 0233 | Cash | 9,900 | No |
| WF #2480 (ICE FIRE Inc) | 5/9/2018 | Edeposit IN Branch/Store 05/09/18 02:54:42 Pm 340 5 2ND St Philadelphia PA 0233 | Cash | 9,900 | No |
| WF #2480 (ICE FIRE Inc) | 5/10/2018 | Edeposit IN Branch/Store 05/10/18 01:14:51 Pm 340 5 2ND St Philadelphia PA 0233 | Cash | 7,250 | No |

| Account | Date | Bank Statement Description | Deposit Components | Amount | CTR Filed (Yes/No) |
|---------|------|---------------------------|--------------------|--------|--------------------|
| WF #2480 (ICE FIRE Inc) | 5/22/2018 | Edeposit IN Branch/Store 05/22/18 11:05:29 Am 340 5 2ND St Philadelphia PA 0233 | Cash | 9,000 | No |

58. During this time period, HADJIEV's cash deposits, totaling $60,420, were used: (a) to make business loan payments, totaling $22,485, to QuarterSpot, Kabbage Inc., and M&T Bank; (b) for jewelry industry transactions, totaling $15,409, to E. Lee's Jewelry, TNS Online, and Veronica Cortes; and (c) to pay rent, totaling $3,728, for 330 South Street.

<u>January 23, 2019</u>

59. On January 23, 2019, HADJIEV purchased three allegedly stolen Rolex watches with a total retail value of $109,250 from UC1. On that date, HADJIEV withdrew $2,000 from ICE FIRE's Citizens Bank #4140. The remaining cash used by HADJIEV to purchase the watches originated from an unknown source.

60. Between January 23 and February 13, 2019, $37,200 in cash was deposited into Citizens Bank #4140.

61. Below is a listing of cash deposit activity in this period when the total cash deposited on a single day approached the $10,000 CTR reporting limit. Only one deposit, on February 5, 2019, exceeded $10,000 and that deposit generated the filing of a CTR by Citizens Bank.

27

With the exception of that February 5, 2019 deposit, the timing and amount of these cash

deposits appear to be structured in a manner to avoid the filing of a CTR.

| Account | Date | Bank Statement Description | Deposit Components | Amount | CTR Filed (Yes/No) |
|---------|------|----------------------------|--------------------|--------|---------------------|
| Citizens Bank #4140 (ICE FIRE Inc) | 1/28/2019 | Deposit | Cash | $3,300 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 1/31/2019 | Deposit | Cash | 6,000 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 2/1/2019 | Deposit | Cash | 800 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 2/5/2019 | Deposit | Cash | 16,000 | Yes |
| Citizens Bank #4140 (ICE FIRE Inc) | 2/11/2019 | Deposit | Cash | 3,500 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 2/12/2019 | Deposit | Cash | 7,000 | No |

62. During the review period, HADJIEV's cash deposits totaled $37,200, were used to make

credit card payments, totaling $25,626, to American Express, and were used to conduct

transactions, totaling $5,085, with jewelry related businesses.

**Summary of Financial Transactions in HADJIEV's bank accounts
From January 2017 through February 2019**

63. For the period of time from January 2017 through February 2019, a total of $2,595,759.33

was deposited into HADJIEV's bank accounts (excluding inter-account transfers) and, of that

28

total, $1,876,364 (72.3%) was deposited in cash. Only seven cash deposits, totaling

$108,300, were more than $10,000. By contrast, 87 deposits, totaling $844,687, were for

amounts between $9,000 and $10,000. The following is a breakdown of the cash deposits

into HADJIEV's bank accounts:

| Cash Deposit Range | Number of Cash Deposits | Total of Cash Deposits |
|---|---|---|
| $1 - $1,000 | 149 | $87,498 |
| $1,000+ - $2,000 | 47 | $57,165 |
| $2,000+ - $3,000 | 28 | $66,532 |
| $3,000+ - $4,000 | 31 | $105,030 |
| $4,000+ - $5,000 | 31 | $137,800 |
| $5,000+ - $6,000 | 24 | $124,100 |
| $6,000+ - $7,000 | 18 | $112,970 |
| $7,000+ - $8,000 | 16 | $115,910 |
| $8,000+ - $9,000 | 14 | $116,372 |
| $9,000+ - $10,000 | 87 | $844,687 |
| $10,000+ | 7 | $108,300 |

64. Checks and wire transfers, totaling $294,362, that appear to be related to customer purchases,

also were deposited into HADJIEV's bank accounts during this time period.

29

65. Credit card payments, totaling $826,584, were made during this time period from HADJIEV's bank accounts.

66. In addition, during this time period, $74,142 in payments were made to the IRS and the United States Treasury; $24,553 in payments were made to Upper Darby School District; and $15,030 in payments were made to Upper Darby Township.

67. Also, payments, totaling $117,624 and made payable to P.A. and D.A., many referencing rent, water and taxes for 330 South Street, were made during this time period.

68. Payments for financial services, totaling $50,458, incluing $24,905 to Financial Pacific Leasing, were made during this period.

69. Analysis of ICE FIRE's Citizens Bank #4140, since it was opened, demonstrates the same pattern of structuring cash deposits the $10,000 CTR reporting limit:

| Account | Date | Bank Statement Description | Deposit Components | Amount | CTR Filed (Yes/No) |
|---------|------|---------------------------|-------------------|--------|--------------------|
| Citizens Bank #4140 (ICE FIRE Inc) | 10/22/18 | Deposit | Cash | 9,980 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 10/23/18 | Deposit | Cash | 5,300 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 10/25/18 | Deposit | Cash | 9,960 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 10/31/18 | Deposit | Cash | 7,000 | No |

| Account | Date | Bank Statement Description | Deposit Components | Amount | CTR Filed (Yes/No) |
|---------|------|-----------------------------|--------------------|--------|--------------------|
| Citizens Bank #4140 (ICE FIRE Inc) | 11/15/18 | Deposit | Cash | 9,900 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 11/16/18 | Deposit | Cash | 450 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 11/19/18 | Deposit | Cash | 9,996 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 11/21/18 | Deposit | Cash | 6,000 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 11/26/18 | Deposit | Cash | 9,960 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 11/27/18 | Deposit | Cash | 1,000 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 11/28/18 | Deposit | Cash | 5,600 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 11/29/18 | Deposit | Cash | 9,980 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 11/30/18 | Deposit | Cash | 700 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 12/14/18 | Deposit | Cash | 9,000 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 12/19/18 | Deposit | Cash | 9,000 | No |
| Citizens Bank #4140 (ICE FIRE Inc) | 12/21/18 | Deposit | Cash | 7,000 | No |

31

70. Based on this analysis of HADJIEV's bank account transactions, there is probable cause to believe that HADJIEV was receiving and depositing cash proceeds from the sale of stolen jewelry into the ICE FIRE business bank accounts, causing and attempting to cause ICE FIRE to fail to file reports relating to the cash receipts by ICE FIRE, structuring the cash deposits into the bank accounts to avoid reporting requirements, commingling the structured cash deposits with other funds in the accounts, and using those structured deposits to operate ICE FIRE.

**CONCLUSION**

71. Based on the  above facts, my training and experience and the training and experience of other agents with whom I work, I have probable cause to believe HADJIEV knowingly purchased items, which were represented to HADJIEV as stolen and which HADJIEV acknowledged to be stolen, during undercover activities conducted by the FBI.  During the transactions at the store operated by HADJIEV, it was also represented to HADJIEV that allegedly stolen items came from a state other than Pennsylvania. HADJIEV purchased from CS1 and UC1 ten certified Rolex watches, with a total retail value of $275,700, for $53,500. One of those allegedly stolen Rolex watches purchased by HADJIEV was then sold by HADJIEV to CS3 and UC2. When that Rolex watch was examined after the sale to CS3 and UC2, it was determined the serial number had been removed and there is probable cause to believe that HADJIEV removed that serial number before selling that Rolex watch  to CS3

and UC2. This is a further indication that HADJIEV was aware that the items he purchased from UC1 were stolen. Moreover, during that sale, HADJIEV attempted to convince CS3 to structure the payments to avoid reporting requirements. HADJIEV accepted $29,000 from CS3 and did not file the appropriate IRS paperwork, Form 8300.

72. In addition, financial analysis of HADJIEV's business bank accounts, including the Citizens Bank account, show a pattern of cash deposits around the time of the purchases which indicate the proceeds from the illicit purchases are being deposited into the business bank accounts and used to fund business operations. HADJIEV used the proceeds from the illicit purchases to attempt to legitimize ICE FIRE. HADJIEV also deposited the cash proceeds into the business bank accounts, including the Citizens Bank account, and commingled the cash with other funds with the intent to conceal the source of the cash proceeds. The cash deposits, further, in many instances were structured to avoid the filing of CTRs for amounts over $10,000. HADJIEV regularly deposited amounts just below the threshold, to include multiple transactions on the same day, within very short time frames.

73. HADJIEV's actions in buying allegedly stolen watches, selling one of those allegedly stolen watches, structuring the deposits of the proceeds from that sale into his business account, and using the funds from the sale of the allegedly stolen watches to pay business related expenses are indicative of the type of activities HADJIEV conducts through his jewelry business. The actions taken by HADJIEV during these undercover sales and purchases, to include acknowledging the items were stolen, not providing receipts, not filing proper documentation

to the IRS, attempting to convince CS3 to pay in structured amounts, and laundering money from illicit purchases and sales, constitute violations of 18 U.S.C. § 1956 (laundering of monetary instruments), 31 U.S.C. § 5324(a) (structuring transactions to evade reporting requirement), and 31 U.S.C. § 5324(b) (causing or attempting to cause a nonfinancial trade or business to fail to file reports relating to coins and currency received in nonfinancial trade or business).

74. Based on the above facts, my training and experience and the training and experience of other agents with whom I work, I have probable cause to believe that DIMITRE HADJIEV committed the offenses of money laundering, in violation of 18 U.S.C. § 1956, structuring cash transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324(a), and causing and attempting to cause a business to fail to file reports relating to the receipt of coins and currency, in violation of 31 U.S.C. § 5324(b).

75. I submit that this affidavit also supports probable cause for a warrant to search ICE FIRE, 330 South Street, Philadelphia, Pennsylvania, described more fully in Attachment A, and to seize the items described in Attachment B.

76. Based on the above facts, my training and experience and the training and experience of other agents with whom I work, I have probable cause to believe that the funds in Citizens Bank account No. 6233944140 are property involved in money laundering, in violation of 18 U.S.C. § 1956, property involved in the structuring of cash transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324(a), property involved in causing and

34

attempting to cause a business to fail to file reports relating to the receipt of coins and

currency, in violation of 31 U.S.C. § 5324(b), and property traceable thereto.  As such, there

is probable cause to believe that the funds in Citizens Bank account No. 6233944140 are

subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1), 981(a)(1)(C), 982(a)(1), and 984, 28

U.S.C. § 2461, and 31 U.S.C. §§ 5317(c)(1) and 5317(c)(2).

77. Title 18, United States Code, Section 984, specifically provides that in any civil forfeiture

action commenced within one year from the date of the offense, in which the subject property

is funds deposited in an account in a financial institution, it shall not be necessary for the

government to identify the specific property involved in the offense that is the basis for the

forfeiture and it shall not be a defense that the property involved in such an offense has been

removed and replaced by identical property.

78. This Affidavit is submitted in support of a seizure warrant under 18 U.S.C. § 981(b), in part

as incorporated by 31 U.S.C. § 5317(c)(2), as well as under 21 U.S.C. § 853(f), as

incorporated by 18 U.S.C. § 982(b), 28 U.S.C. § 2461, and 31 U.S.C. § 5317(c)(1). Under 21

U.S.C. § 853(f), the Court shall issue a warrant authorizing the seizure of property if there is

probable cause to believe that the property to be seized would, in the event of conviction, be

subject to forfeiture and an order under subsection 853(e) may not be sufficient to assure the

availability of the property for forfeiture. A restraining order in this case may not be adequate

to preserve the forfeitable funds because the funds in the Citizens Bank account may easily

be withdrawn in cash or wired to another account. Accordingly, a restraining order is not

35

sufficient, and a warrant for the seizure of the funds contained within Citizens Bank account should be issued.

79. I therefore respectfully request that the Court issue the attached seizure warrant authorizing the United States to seize the funds in Citizens Bank account No. 6233944140 as proceeds of and property involved in the offenses described above, and property traceable thereto.

## REQUEST FOR SEALING

80. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding

36

forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Kyle Wood
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on August ____, 2019·

HONORABLE TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

37